**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RYAN HOPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-227 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| NORFOLK SOUTHERN CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Ryan Hopkins, a white man, worked in the canine unit of the Norfolk Southern Police, a law enforcement group within a railroad company. He applied for two supervisory positions, but he didn't get them. The company promoted two diverse candidates instead.

Months later, after a series of conflicts, Hopkins left the company. The parties disagree about whether he quit or got fired. Either way, he left unhappy. And he didn't go quietly.

Hopkins responded by filing suit, alleging race discrimination, sex discrimination, and retaliation. Hopkins believes that the company promoted one of his co-workers because she is a black woman, and promoted the other co-worker because he is mixed-race.

That allegation didn't stand the test of time. After a year of discovery, Norfolk Southern moved for summary judgment. The company points out that the other two candidates had stronger educational backgrounds, and equal or better credentials. Hopkins bombed the job interview, too. In fact, Hopkins admitted at deposition that he wasn't the most qualified candidate.

The circumstances of his departure don't suggest retaliation, either. Hopkins did complain about discrimination, but he didn't leave the company until four months later. The

record can't support a connection between his complaint of discrimination and his departure from the company. The record shows that he left Norfolk Southern after a series of other conflicts, including a belated disclosure of an outside business and a refusal to sign a disclosure form.

For the following reasons, Defendant's motion for summary judgment is hereby granted.

**Background**

Norfolk Southern Corporation runs Norfolk Southern Railway, a common carrier operating a freight railroad that transports cargo. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 3 (Dckt. No. 71). It gets valuable cargo from here to there.

The Norfolk Southern Police ("NSP") protects the freight hauled by Norfolk Southern. *Id.* at ¶¶ 4–5. NSP also ensures the safety of the company's employees, customers, cargo, and facilities. *Id.* NSP maintains field offices, investigation units, special operations response teams, and a communications center. *Id.* at ¶ 4. It has canine units, too. *Id.*

Ryan Hopkins joined NSP as a Special Agent in 2016, before transferring to the canine unit in 2018. *See* Pl.'s Decl., at ¶ 26 (Dckt. No. 69-49).

***The Job Posting***

In July 2021, Norfolk Southern posted job openings for two Supervisory Special Agent ("SSA") positions in Chicago. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 71). The job posting revealed the company's wants and needs.

Norfolk Southern preferred applicants with six to ten years of experience. *See* SSA Job Posting (Dckt. No. 63-6). But at the very least, applicants needed to have three to five years of experience. *Id.*

The company preferred applicants with a bachelor's degree, especially in the areas of social sciences (criminal justice and criminology) and business. *Id.* But a college degree wasn't mandatory. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 10 (Dckt. No. 71).

The company did require certain licenses and certifications. Candidates needed to be a certified and commissioned law enforcement officer, as well as a commissioned railway police officer. *See* SSA Job Posting (Dckt. No. 63-6).

The job posting explained that a Supervisory Special Agent "[p]rotects the corporate interests of Norfolk Southern through law enforcement activities authorized as a certified and commissioned police officer and provides supervision of subordinate in assigned values." *Id.* The job posting included a list of specific job duties, too. An SSA supervises and participates in investigations, oversees officers, responds to calls from the police, performs inspections, and completes other tasks to protect the company's people and property. *Id.*

Norfolk Southern characterized the SSA position as a corporate supervisory position, distinct from a supervisor position for an ordinary police department. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 71).

In other words, an SSA supervises special agents and helps to prevent crime. But an SSA also interacts with customer representatives and Norfolk Southern executives. *Id.* at ¶¶ 9, 11. Norfolk Southern required SSAs to display a professional demeanor and represent the company well. *Id.* at ¶ 11.

Applicants put their hat in the ring by completing online application forms and submitting cover letters and resumes. *Id.* at ¶ 12.

Hopkins applied for a promotion to the SSA role. *Id.* at ¶ 17. He had a dozen years of experience as a police officer. *See* Pl.'s Decl., at ¶ 12 (Dckt. No. 69-49). In addition, Norfolk

Southern hired Hopkins as a Special Agent in 2016, before transferring him to a Canine Special Agent position in 2018. *Id.* at ¶ 26; *see also* Hopkins Dep. Tr., at 127:4-20 (Dckt. No. 63-2).

Hopkins completed the application and submitted a resume, but did not provide a cover letter. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 17 (Dckt. No. 71). Hopkins did not have a college degree. *Id.* at ¶ 18.

The company selected 17 applicants for interviews, including Hopkins. *Id.* at ¶¶ 12, 21. The interviews took place in July 2021. *Id.* at ¶ 21. At that point, Hopkins had roughly five years of experience with the company.

The selection process had three steps. The first step involved an interview with four people.

The panel of four interviewers included the Senior Agent in Charge ("SAC") of the Chicago NSP, Reyes Moran, as well as SAC Dragani, SAC Pearson, and SSA Cottrell. *Id.* at ¶ 22. They asked the same questions to each candidate, and they rotated who asked each question. *Id.* at ¶ 23.

Moran is a Hispanic male or a black male. *Id.* at ¶ 22. Dragani is a white male. *Id.* Pearson is a white male. *Id.* And Cottrell is a black male. *Id.* So, two of the four interviewers were white males – just like Hopkins. And all of them were men.

The panelists made recommendations based on those interviews. Three of the interviewers (Dragani, Pearson, and Cottrell) made recommendations to both SAC Moran (meaning the fourth interviewer) and to Superintendent Fogarty. *See, e.g.*, Cottrell Dep. Tr., at 17:22-24 (Dckt. No. 63-13). SAC Moran also made his own recommendations to Fogarty. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 27–28 (Dckt. No. 71).

The second step involved a decision by Superintendent Fogarty. After receiving recommendations from the interview panelists, Fogarty reviewed the candidate's qualifications and interview notes. *Id.* Then, Fogarty made a recommendation to NSP Director Mark Sinquefield. *Id.*

The third step involved a decision by Director Sinquefield about who to promote. He forwarded the name to the human resources department. *See* Sinquefield Dep. Tr., at 19:17 – 21:12, 26:9-13 (Dckt. No. 63-3).

The record is a bit murky about the exact role played by Sinquefield. The parties did not pin it down at deposition, and did not explain it well in their briefs. Sinquefield testified that he received recommendations and forwarded the applications to human resources. *Id.* By the sound of things, a candidate could not get the promotion without the sign-off of Sinquefield. *Id.* at 21:11-12 ("I took no exception to it."). But Sinquefield did not get deeply involved and get dirt under his fingernails during the selection process, either.

So, to get the promotion, a candidate had to pass through a gauntlet with three steps. The candidate needed to receive the backing of the interviewers, and then Superintendent Fogarty, and then Director Sinquefield.

The pool of applicants included two Special Agents, Brittany Jones-Wilson and David Butkiewicz. *Id.* at ¶¶ 13, 15. Both of them submitted cover letters and resumes with their applications. *Id.*

Jones-Wilson, a black woman, had worked as a certified law enforcement officer since 2017. *Id.* at ¶ 14. She became a special agent with NSP on January 7, 2019. *Id.* She had a bachelor's degree in criminal justice and was part of NSP's Special Operations Response Team, also known as SORT. *Id.* Jones-Wilson also had completed a training program called "Growing

My Communication Skills" that focused on executive presence, communication, and leadership development. *Id.*

Jones-Wilson impressed the panel during her interview. *Id.* at ¶ 25; *see also* Moran Dep. Tr., at 33:21 – 34:12 (Dckt. No. 63-5); Cottrell Dep. Tr., at 23:9-16 (Dckt. No. 63-12). In fact, she apparently nailed it.

The company presented evidence that Jones-Wilson "excelled in her interview, performing far better than Plaintiff. She was well prepared, confident, professional, and impressed the panel with her responses to their questions." *See* Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 63). Hopkins denies it, but offers no countervailing evidence. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 71).

The panel recommended Jones-Wilson for the position. And she got it. She got one of the two open SSA positions. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 27 (Dckt. No. 71).

The other candidate, David Butkiewicz, impressed the interview panel, too. *See* Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 63). Once again, Hopkins denies it. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 71). But at summary judgment, a raw denial counts for nothing.

Unlike Jones-Wilson, Butkiewicz didn't have a college degree, but it was in the works. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 16 (Dckt. No. 71). He was in the process of completing a bachelor's degree in public safety administration. *Id.* Butkiewicz also had a long track record with the company. He joined NSP as a special agent in 2010, and he worked as a member of NSP's Special Operations Response Team. *Id.*

The panel recommended Butkiewicz for the second SSA position. *Id.* at ¶ 28. He got it.

So, when it was all said and done, Hopkins got passed over for both positions. So did the other 14 applicants who interviewed for the two positions. Seventeen people applied, and fifteen of them didn't get it, including Hopkins.

At deposition, Hopkins admitted that he was not the most qualified applicant. *Id.* at ¶ 24; *see also* Hopkins Dep. Tr., at 62:10-13 (Dckt. No. 63-2). But he believes that he was more qualified than Jones-Wilson and Butkiewicz. *See* Hopkins Dep. Tr., at 62:10-13 (Dckt. No. 63-2).

Hopkins didn't do any prep work before the interview. When asked what he did to prepare, Hopkins responded that he did "absolutely nothing." *Id.* at 120:19-21.

The lack of preparation apparently showed. Hopkins didn't impress anyone during his interview. Moran offered the following summary of Hopkins's performance: "I just really didn't feel Mr. Hopkins interviewed well and he really used his interview time for almost of a grievance . . . he had several complaints and stuff that he was unsatisfied with within the department. And he spent a lot of that time during the interview talking about those things." *See* Moran Dep. Tr., at 23:13 – 24:7 (Dckt. No. 63-5); *id.* at 34:22 – 35:9; Cottrell Dep. Tr., at 22:9 – 23:1 (Dckt. No. 63-13).

The lack of a promotion didn't go over well with Hopkins.

On August 17, 2021, Hopkins contacted the Norfolk Southern Equal Opportunity Office ("EEO"). *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 30 (Dckt. No. 71). He complained that the panel had selected Jones-Wilson based on her race, sex, and sexual orientation. *Id.*

The Norfolk Southern Equal Opportunity Office investigated that allegation, and ultimately found no basis for it. *Id.* at ¶ 35.

The EEO investigator, Vanessa Ennis, did not participate in the hiring process. But she did testify about her investigation.

Ennis testified about her interview with Sinquefield during the investigation. Sinquefield told her that Jones-Wilson "was qualified," and "she aligned with the company's DEI, diversity, equity, and inclusion initiative." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 1 (Dckt. No. 78); *see also* Ennis Dep. Tr., at 37:2-4 (Dckt. No. 63-15).

At deposition, Sinquefield testified about whether he promoted Jones-Wilson based on her race. He testified that she did not get the promotion based on diversity considerations:

> Q: Did you recommend her for promotion because she's black?
>
> A: No, sir.
>
> Q: Did you recommend her for promotion in order to increase the diversity – the racial diversity of Norfolk Southern police officers?
>
> A: No, sir.
>
> Q: Was there any racial diversity component to her promotion?
>
> A: The racial component of our promotion system is making sure there's a fair and balanced opportunity for everyone to apply and if they are qualified to be interviewed.

*See* Sinquefield Dep. Tr., at 20:11-23 (Dckt. No. 63-3).

After filing the EEO complaint, Hopkins participated in a Teams meeting with Superintendent Fogarty, SAC Moran, and Mark Sinquefield (the NSP Director) later in August.[1] *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 78); Fogarty Dep. Tr., at 38:12-14 (Dckt. No. 63-7). Fogarty, Moran, and Sinquefield wanted to discuss Hopkins's discrimination complaint. *See* Sinquefield Dep. Tr., at 17:9-17 (Dckt. No. 63-3).

---

[1] Hopkins's brief says that the meeting took place on August 31, but that specific date doesn't appear in the record. Even so, the exact date is immaterial.

The parties offer sharply different versions of what happened during that meeting. According to Hopkins, all three participants "verbally retaliated against him as in attacking him and criticizing him for having filed an EEO complaint." *See* Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 70).

Norfolk Southern characterizes the meeting much differently. According to the company, no retaliation took place at all. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 78). Sinquefield testified that he "conveyed to [Hopkins] that he was a valued member of [the] department, and we take his complaints very seriously. However, after investigation, we could not substantiate any of them." *See* Sinquefield Dep. Tr., at 17:9-17 (Dckt. No. 63-3). Sinquefield testified that Hopkins seemed "disappointed," but was "very cooperative." *Id.* at 18:14-21.

***Holiday Time***

The story then jumps forward a few months. Hopkins got into a dispute with the company about a day off for a flexible holiday.

At the end of 2021, the pandemic continued to plague the country. Hopkins got exposed to COVID-19, so he stayed home for two weeks as required by company policy. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 71). He remained home from December 3 to 17, 2021. *Id.*

Misfortune then struck his plumbing. On December 17, the last day of the stay-at-home period, a pipe burst outside his home. *Id.* at ¶ 37. So Hopkins asked to stay home for another two days. The company approved his request. *Id.*

The stay-at-home period for COVID-19 overlapped with a previously scheduled day off. At some point, Hopkins had scheduled a "flexible holiday" for December 5, 2021. *Id.* at ¶ 38.

Flexible holidays are days that Norfolk Southern employees can take off outside of traditional calendar holidays. *Id.* at ¶ 39.

When he returned to work on December 19, Hopkins asked to reschedule his flexible holiday. *Id.* at ¶ 38. As Hopkins saw things, December 5 shouldn't count as a stay-at-home day *and* as a flexible holiday. *Id.* He viewed it as double dipping, in a bad way.

The company denied his request. Hopkins learned the news from his supervisor, Butkiewicz, meaning the person who got the SSA promotion instead of Hopkins. *Id.* at ¶ 42. Butkiewicz explained that he could not reschedule a flexible holiday that had already passed. *Id.* at ¶ 41.

Hopkins became upset. *Id.* at ¶ 42. At deposition, Hopkins characterized the conversation as a "heated argument." *See* Hopkins Dep. Tr., at 226:15-16 (Dckt. No. 63-2).

That in-person conversation with Butkiewicz took place while Hopkins sat in his car, in the middle of a call with his wife on speakerphone. *See* Pl.'s Resp. to Def.'s Statement of Facts, at 9 (Dckt. No. 71). Then, Hopkins said something about quitting. But the parties disagree about whether Hopkins was talking to Butkiewicz or his wife.

At deposition, Hopkins admitted that he possibly said something to his wife along the lines of "I'm going to quit," and did so in front of Butkiewicz. *See* Hopkins Dep. Tr., at 227:1-13 (Dckt. No. 63-2). But according to Hopkins, he never told *Butkiewicz* that he quit, regardless of what he said to his wife. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 43 (Dckt. No. 71). As Hopkins tells it, he simply told Butkiewicz, "I've had enough of this," and then drove away. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 44 (Dckt. No. 71).

Hopkins attempted to call SAC Moran, but Moran didn't pick up. *Id.* at ¶ 45.

So Hopkins went up the chain and called Superintendent Fogarty, and the two of them spoke. *Id.* The parties offer different versions of what happened during that call.

Fogarty testified that Hopkins said that "he didn't need the job . . . and that he quit." *See* Fogarty Dep. Tr., at 22:21-23 (Dckt. No. 63-7). Hopkins, however, tells it differently. According to Hopkins, he didn't tell Fogarty that he quit. Instead, Hopkins told Fogarty that "they were trying to force [Hopkins] to quit." *See* Hopkins Dep. Tr., at 247:8-11 (Dckt. No. 63-2).

Meanwhile, SSA Butkiewicz called SAC Moran and gave him the run down on the argument with Hopkins. *See* Pl.'s Resp. to Def.'s Statement of Facts, at 10 (Dckt. No. 71). After that conversation, Butkiewicz asked Hopkins to come into the NSP office to speak with him. *Id.* at ¶ 49.

Butkiewicz then informed Hopkins that the company was taking him out of service due to his emotional state. *Id.* at ¶ 51. Butkiewicz ordered Hopkins to surrender his badge, his firearm, the keys to his patrol car, and his ID. *Id.* Hopkins complied, and his wife drove him home. *Id.*

***Hopkins' Second EEO Complaint***

The next day, Hopkins called the Norfolk Southern EEO helpline and left a voicemail. *Id.* at ¶ 52. Susan Decker, an EEO Investigator with Norfolk Southern, returned the call. *Id.*

Hopkins complained that the company had retaliated against him for making an EEO complaint months earlier about the promotion of Jones-Wilson. *Id.* at ¶ 53. Hopkins alleged that the company had refused to reschedule his flexible holiday, and had removed him from service, because of his EEO complaint. *Id.*

The parties disagree about whether Hopkins admitted making a statement about quitting during that call with Decker.

The company points to Decker's notes. According to the notes, Hopkins admitted to Decker that he had made a statement about quitting: "Hopkins admitted to I/O [investigating officer] that he was out of service because he made the statement that he quit. I/O explained that it is expected to remove him from service." *See* Investigation Summary (Dckt. No. 63-22, at 2 of 5).

Hopkins disagrees. He contends that he never told Decker that he made a statement about quitting. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 71). Hopkins also denies that Decker ever explained company policy about what happens when an employee quits. *Id.*

Later that day, Hopkins called the Norfolk Southern Ethics and Compliance hotline and spoke with Thomas Nolan, a Senior Compliance Investigator. *Id.* at ¶ 56. Once again, Hopkins complained about the loss of a flexible holiday and his removal from service. *Id.* at ¶ 57. He reiterated his belief that the company had retaliated against him for filing an EEO complaint about Jones-Wilson. *Id.* Hopkins told Nolan that he did not quit. *Id.*; *see also* 12/22/21 Nolan Email (Dckt. No. 69-38).

***Off-Duty Employment***

Other issues came to the surface, too. Hopkins made a late-breaking disclosure about another line of work. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 59 (Dckt. No. 71).

Norfolk Southern has a policy about outside employment. If an NSP officer engages in any other employment, that officer must submit an "Off-Duty Employment Form." *Id.* at ¶ 60.

As it turns out, Hopkins likes both trains and trucks. Beginning in April 15, 2021, Hopkins owned and operated "Hopkins Towing." *Id.* at ¶ 62. He continued running that side business during the rest of his tenure with Norfolk Southern.

During the call with Superintendent Fogarty on December 19, 2021, Hopkins disclosed for the first time that he owned and operated Hopkins Towing. *Id.* at ¶ 59; *see also* Fogarty Dep. Tr., at 40:23 – 41:17 (Dckt. No. 63-7).

On December 20, the day after the company took Hopkins out of service, Superintendent Fogarty asked Hopkins to come into NSP's Chicago office. *Id.* at ¶ 63. Hopkins met with Fogarty and SSA Kevin Cottrell. *Id.* They asked Hopkins to sign an Off-Duty Employment Form related to his towing business. *Id.*

Hopkins refused. *Id.* at ¶ 64. As a result, they told Hopkins that he would remain out of service and investigated for insubordination. *Id.*; *see also* Hopkins Dep. Tr., at 174:16-23 (Dckt. No. 63-2).

Fogarty memorialized this meeting in an email later that day. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 78). According to the email, Hopkins told Fogarty and Cottrell that "he had been in contact with NS HR and filed [an] EEO complaint." *Id.*

***The End of Employment with Norfolk Southern***

Hopkins reached the end of the line with the company. He turned in his equipment on December 20, 2021, except the company's canine. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 66 (Dckt. No. 71). NSP retrieved the dog from his home the next day. *Id.* at ¶ 68.

***The Lawsuit***

Before long, Hopkins filed suit, alleging discrimination. He later filed an amended complaint with four counts. *See* First Am. Cplt. (Dckt. No. 23).

The first claim is a race discrimination claim under 42 U.S.C. § 1981. The second claim is a retaliation claim under 42 U.S.C. § 1981. The third claim is a race and sex discrimination claim under Title VII. The fourth claim is a retaliation claim under Title VII.

The parties embarked on discovery. The parties originally envisioned that discovery would take six months. As the case rolled along, the parties requested and received several extensions of the deadline. When it was all said and done, discovery took more than a year.

At the tail end of discovery, Hopkins requested leave to file a second amended complaint. *See* Mtn. (Dckt. No. 47). That request came late in the game. Hopkins asked to amend his complaint six months after the deadline for amendments to the pleadings.

This Court denied the request, without prejudice. *See* 2/23/23 Order (Dckt. No. 50). The order explained that Hopkins had made the request six months too late. And the order flagged the fact that the motion didn't give a reason for the request.

Even so, this Court didn't close the door and bolt it shut. This Court invited Hopkins to file another motion and explain why this Court should allow an amended complaint. "[T]he Court needs to hear more. The Court will give Plaintiff an opportunity to say more. The motion is denied without prejudice." *Id.*

Hopkins let it go. He did not accept this Court's invitation to refile a motion for leave to amend the complaint.

After discovery, Hopkins revealed that he planned to drop his two claims under 42 U.S.C. § 1981. *See* 7/21/23 Joint Status Report, at 3 (Dckt. No. 57). This Court later dismissed those two claims (Counts I & II) with prejudice. *See* 4/26/24 Order (Dckt. No. 81). So, only the two claims under Title VII remain, meaning the discrimination claim and the retaliation claim.

Norfolk Southern moved for summary judgment.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

Hopkins brings two claims under Title VII. The first claim alleges race and sex discrimination, and the second claim alleges retaliation.

This Court will address them in that order. For the discrimination claim, this Court will address race discrimination first, before turning to sex discrimination.

**I. Race Discrimination**

The race discrimination claim is about getting passed over for the promotions. Hopkins claims that the company didn't give him the job because he is white. He believes that the

company selected Jones-Wilson because she is black, and picked Butkiewicz because he is mixed-race.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a)(1).

Hopkins brings a reverse discrimination claim, but maybe that term is overdue for a much-deserved retirement. After all, reverse discrimination is discrimination, and always has been. "It is well settled law that the protections of Title VII are not limited to members of historically discriminated-against groups." *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005); *see also McDonald v. Santa Fe Trail Tansp. Co.*, 427 U.S. 273, 283 (1976) (Marshall, J.) ("Title VII of the Civil Rights Act of 1964 prohibits the discharge of 'any individual' because of 'such individual's race.' Its terms are not limited to discrimination against members of any particular race.") (citation and footnote omitted); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

In discrimination cases, "[w]hen a defendant moves for summary judgment, the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *See Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025) (citation omitted).

One way to satisfy that burden is to go down the well-worn path of *McDonnell Douglas*. That's not the only route. Courts can evaluate the evidence by looking through a holistic lens. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) ("[A]ll evidence belongs in a single pile and must be evaluated as a whole."). At summary judgment, "[w]hat matters

is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor." *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020).

The two routes end up at the same place. *See Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) ("Although there are many tests and rubrics for viewing discrimination claims, it is important to recall that, at the end of the day they are merely convenient ways to organize our thoughts."). And "*McDonnell Douglas* is entirely consistent with our holding in *Ortiz*, and it remains an efficient way to organize, present, and assess evidence in discrimination cases." *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 891 (7th Cir. 2025) (cleaned up).

In the end, "the only question that matters" is "whether a reasonable fact-finder could conclude that a plaintiff suffered the adverse employment action because of her membership in a protected class." *See Mitchell*, 143 F.4th at 809.

The parties go down the *McDonnell Douglas* road, without mentioning *Ortiz*, so this Court will ride along.

Under the *McDonnell Douglas* framework, a plaintiff has the initial burden "to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *See Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To make a prima facie case, a plaintiff must show that he or she "(1) belongs to a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees outside of [his or] her protected class." *See Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025); *see also Igasaki*

*v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). For most plaintiffs, this burden is "not onerous." *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

On this record, no reasonable jury could return a verdict in favor of Hopkins. He failed to present a prima facie case, and the record could not support a finding of pretext.

### A. Prima Facie Case

For starters, Hopkins has fallen short of presenting evidence that supports a prima facie case. On this record, no reasonable jury could find discrimination.

The Supreme Court recently clarified the legal landscape in reverse discrimination cases. *See Ames v. Ohio Department of Youth Services*, 605 U.S. 303, 310 (2025). Before *Ames*, many courts, including the Seventh Circuit, required a heightened showing in reverse discrimination cases. *See, e.g.*, *Paterakos v. City of Chicago*, 147 F.4th 787, 796 n.1 (7th Cir. 2025).

Under the old regime, white plaintiffs had to carry a heavier burden over a higher hurdle than other plaintiffs. White plaintiffs needed to offer evidence of "background circumstances . . . show[ing] an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." *See Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021). The standard wasn't the same for white plaintiffs and non-white plaintiffs.

That approach seemed to rest on the premise that white people do not experience discrimination, or maybe that white people are unlikely to discriminate against other white people on the basis of race. *See, e.g.*, *Parker v. Baltimore & O. R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981) (Mikva, J.) ("Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society."); *Harding v. Gray*, 9 F.3d 150, 153

(D.C. Cir. 1993) (Mikva, J.) ("No such inference [of discrimination] arises when, as in this case, the plaintiff is a white man. Invidious racial discrimination against whites is relatively uncommon in our society, and so there is nothing inherently suspicious in an employer's decision to promote a qualified minority applicant instead of a qualified white applicant."); *Mlynczak v. Bodman*, 442 F.3d 1050, 1057 (7th Cir. 2006) ("[I]t is the unusual employer who discriminates against majority employees.") (citation omitted); *see also Ames*, 605 U.S. at 315 (Thomas, J., concurring) (noting that the background circumstances test was "created by D.C. Circuit judges in *Parker*").

From a factual perspective, that assumption was dubious from the get-go. It's not hard to think of counterexamples. After all, discrimination doesn't always require animosity. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214–15 (2023) (acknowledging that race discrimination can come from "commendable goals"). But a bigger problem was the utter lack of any foothold in the statutory text.

In *Ames*, the Supreme Court unanimously held that "proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group." *See Ames*, 605 U.S. at 310. The requirement that plaintiffs in a majority group demonstrate "background circumstances" was "not consistent with Title VII's text" or Supreme Court case law interpreting Title VII. *Id.* at 305–06.

*Ames* leveled the playing field and removed the heightened burden for white plaintiffs. *See Ames*, 605 U.S. at 305–06. Now, "[a]t the first step of the familiar three-step" *McDonnell Douglas* framework, a white plaintiff simply needs to "produc[e] enough evidence to support an inference of discriminatory motive." *Id.* at 308.

A plaintiff can satisfy that evidentiary burden "by presenting evidence 'that [he] applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* at 309 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

The same standard applies to everyone. Even so, the hurdle is too high for Hopkins. He has fallen short of carrying his prima facie burden.

Hopkins did present enough evidence on three of the four prongs. The first prong is straightforward – if not downright unnecessary – in a race discrimination case. By definition, Hopkins belongs to a protected class (like everyone else), because he has a race. And race is a protected category.

In a race discrimination case, it doesn't make sense to ask if the plaintiff is a member of a protected class, because everyone enjoys protection against race discrimination. "[E]veryone has a race, and in that sense, *everyone* is a member of a protected class. . . . Saying that someone is a member of a protected class doesn't say anything, because the circle of protection covers everyone. Asking if a person is a member of a protected class in a race-discrimination case isn't much better than asking if a person is a person." *See Reese v. Hub Group Inc.*, 2026 WL 558111, at *12 (N.D. Ill. 2026) (emphasis in original).

Hopkins presented enough evidence on the second prong, too. The record includes evidence that Hopkins met the basic requirements for the job. *See* SSA Job Posting (Dckt. No. 63-6). He had a dozen years of experience as a police officer, and he worked as a special agent for Norfolk Southern for five years. *See* Pl.'s Decl., at ¶¶ 12, 26 (Dckt. No. 69-49).

Hopkins had some other things going for him, too. He had experience as an officer-in-charge of shifts when his supervisors were off duty. *See* Hopkins Dep. Tr., at 50:7-12 (Dckt. No.

63-2; *see also* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 4 (Dckt. No. 78). He was ranked as an "exceptional performer" in his performance review. *See* 8/19/21 Selection Email (Dckt. No. 63-9, at 5 of 6).

Maybe he wasn't the *most* qualified candidate. But he did satisfy the basic requirements for the position.

Hopkins also offered facts supporting the third prong. Hopkins suffered an adverse employment action because he got passed over for the job. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 559 (7th Cir. 2014) ("[D]emoting or failing to promote an employee is an adverse employment action that can give rise to liability under Title VII.").

But Hopkins runs out of steam when he gets to the fourth element. The record cannot support the notion that he received less favorable treatment than a non-white, similarly situated employee.

"Under the *McDonnell Douglas* framework, the fourth element of a prima facie case requires that the plaintiff show he was treated less favorably than a similarly situated employee outside his protected class. Though similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022) (cleaned up).

"To prevail by showing a similarly situated employee was treated differently, a plaintiff must show the purported comparator was 'directly comparable to her in all material respects' so as to 'eliminate other possible explanatory variables.'" *Gamble v. County of Cook*, 106 F.4th 622, 626 (7th Cir. 2024) (citation omitted). "Employees are similarly situated if they dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct

without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Dunlevy*, 52 F.4th at 353.

Viewing the record in a light favorable to Hopkins, the record cannot support a finding that Hopkins was similarly situated to Jones-Wilson and Butkiewicz. The record confirms that they were better qualified, and performed better during the interview process.

Hopkins did satisfy the minimum requirements for the job. But Hopkins didn't check all of the boxes when it came to the company's preferences. He did not have a bachelor's degree, let alone a degree in one of Norfolk Southern's preferred fields. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 18 (Dckt. No. 71). He didn't submit a cover letter with his application, either. *Id.* at ¶ 17.

In his brief, Hopkins focuses most of his attention on Jones-Wilson, not Butkiewicz (meaning the person who got the second spot). The record cannot support the notion that Hopkins and Jones-Wilson were similarly situated. Quite the opposite.

The record reveals that Jones-Wilson was more qualified than Hopkins. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 3 (Dckt. No. 78). Unlike Hopkins, Jones-Wilson had a bachelor's degree. In fact, she had one in a preferred subject area. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No 71).

She had completed communications training. *Id*. She had the requisite work experience, and was a member of NSP's Special Operations Response Team. *Id*.

True, Hopkins had served as an officer-in-charge on multiple occasions, and Jones-Wilson hadn't. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 3–4 (Dckt. No. 78). Even so, that's not enough to conclude that they stood on the same level.

Hopkins was a train wreck in the interview, too. The interview sounds like a disaster. He did not exhibit the professional demeanor that Norfolk Southern required for the role. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 29 (Dckt. No. 71); Moran Dep. Tr, at 23:18 – 24:15, 34:22 – 35:24, 36:5-24 (Dckt. No. 63-5)

One of the interviewers testified that Hopkins interviewed poorly, and "really used his interview time for almost of a grievance . . . he had several complaints and stuff that he was unsatisfied with within the department." *See* Moran Dep. Tr., at 23:13 – 24:7 (Dckt. No. 63-5).

Hopkins did nothing to prepare for his interview, causing one interviewer to comment that Hopkins could not see the "big picture." *See* Hopkins Dep. Tr., at 120:2-21 (Dckt. No. 63-2); 7/14/24 Interview Notes (Dckt. No. 63-9).

As the saying goes, Proper Preparation Prevents Poor Performance. The flipside is often true, too. Improper preparation may not ensure poor performance. But it increases the odds.

Candidates are not similarly situated when one candidate does better in an interview. *See, e.g.*, *Reinebold v. Bruce*, 18 F.4th 922, 926 (7th Cir. 2021); *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016). And a plaintiff is not similarly situated "to persons better qualified for an open position." *See, e.g.*, *Squibb v. Memorial Medical Ctr.*, 497 F.3d 775, 788 (7th Cir. 2009) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)).

Simply put, Hopkins bombed the interview, and Jones-Wilson didn't. So they were not similarly situated.

The other position went to Butkiewicz, a mixed-race man. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 28 (Dckt. No. 71). But once again, the record doesn't support the notion that Hopkins and Butkiewicz were similarly situated.

Like Hopkins, Butkiewicz didn't have a college degree. But unlike Hopkins, Butkiewicz was working on it. He was enrolled in a program for a bachelor's degree, and studied one of the company's preferred areas. *Id.* at ¶ 16. Butkiewicz was also a member of NSP's Special Operations Response Team. *Id.* Butkiewicz also had worked at Norfolk Southern since 2010, so he had six more years of experience with the company than Hopkins. *Id.*

The record also does not contain any evidence that Butkiewicz tanked the interview. Hopkins gave a bad interview, but there is no evidence that Butkiewicz turned people off.

Quite the opposite. Moran, an interviewer, testified that he recommended Butkiewicz for the promotion based on his interview and credentials. *Id.* at ¶ 28. Butkiewicz was well-prepared for the interview, and gave knowledgeable answers. He "impressed" the panel of interviews. *Id.* at ¶ 26.

Viewing the record in a light favorable to Hopkins as the non-movant, the facts cannot support an inference that Hopkins got a raw deal compared to two similarly situated candidates. No reasonable jury could conclude that Hopkins was similarly situated to Jones-Wilson and Butkiewicz. Bombing the interview is reason enough to reach this conclusion.

Hopkins has not come forward with sufficient evidence to support a prima facie case. So he has reached the end of the line. Even so, for good measure, the Court will walk through the next two steps of *McDonnell Douglas*.

**B. The Non-Discriminatory Reason**

The discrimination claim would fail even if Hopkins had presented a prima facie case. The company offered a non-discriminatory reason for its hiring decisions.

When a plaintiff satisfies his initial burden, the burden flips to the employer to provide a legitimate, non-discriminatory reason for the employment decision. *See Ames*, 605 U.S. at 308–09. "This too is a light burden." *See Mitchell*, 143 F.4th at 809.

The record supports the conclusion that Norfolk Southern had legitimate, non-discriminatory reasons for its employment decisions. Without belaboring the point, Norfolk Southern had colorable reasons to conclude that Jones-Wilson and Butkiewicz were stronger candidates.

They had better educational backgrounds. They had equal or better work experience. They exhibited a more professional demeanor. And they didn't crash and burn during their interviews. *See Formella*, 817 F.3d at 514 ("Better performance in an interview is unquestionably a legitimate, nondiscriminatory basis to hire one candidate over another."). Rubbing people the wrong way during a job interview isn't the best way to land a job.

Norfolk Southern has satisfied its burden to show a legitimate, non-discriminatory reason for selecting other candidates.

**C. Pretext**

Norfolk Southern met its burden, so the burden flips back to Hopkins to show that the reason is a pretext for discrimination. *See Dunlevy*, 52 F.4th at 353.

Pretext "is not just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *See Barnes v. Bd. of Trustees of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020) (cleaned up). A plaintiff must show that the employer's stated reason "was not the honest reason for the employer's action." *See Paterakos*, 147 F.4th at 797; *see also Igasaki*, 988 F.3d at 958.

"In determining whether the employer's reason can be characterized as pretextual, we do not evaluate whether the employer's proffered justification was accurate or even whether it was unfair. Our sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). "[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006).

The question is not whether the employer's decision was *right*. The question is whether the employer's explanation is *honest*. *See Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 744 (7th Cir. 2002). After all, "courts are not super-personnel departments who sit in judgment of management decisions." *See Brooks v. Avancez*, 39 F.4th 424, 436 (7th Cir. 2022).

"When an employer honestly believed it promoted the best candidate, its reasoning is not pretext, even if its decision was inaccurate, unfair, foolish, trivial, or baseless." *Cunningham v. Austin*, 125 F.4th 783, 790 (7th Cir. 2025) (St. Eve, J.) (cleaned up); *see also Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.") (citation omitted).

"Pretext can be proven, among other ways, by evidence (1) that the employer's explanation has no basis in fact; (2) of ambiguous or suggestive comments or conduct; or (3) of better treatment of people similarly situated but for the protected characteristic." *Paterakos*, 147 F.4th at 797.

Once again, the evidentiary cupboard is bare. Hopkins points to the relative qualifications of the candidates. But "evidence of applicants' competing qualifications does not constitute evidence of pretext 'unless the differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.'" *Barnes-Staples v. Murphy*, 2022 WL 4534686, at *6 (N.D. Ill. 2022) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002)).

On this record, no reasonable jury could conclude that Norfolk Southern gave a pretexual explanation for taking a pass on Hopkins. Again, Jones-Wilson and Butkiewicz were more qualified. They had comparable or superior work experience, better educational backgrounds, stronger interviews, and exhibited a professional demeanor.

Hopkins had a weaker educational background, and he didn't submit a cover letter. Hopkins also tanked the interview. Turning off people during a job interview isn't a good way to get a promotion.

Hopkins views all of those reasons as pretextual. As he sees things, the company promoted Jones-Wilson based on the company's DEI policy.[2]

Hopkins relies on statements made by one Norfolk Southern employee, Mark Sinquefield (the NSP Director). *See* Pl.'s Resp. Br., at 2–3 (Dckt. No. 75). During Sinquefield's interview with the EEO investigator (Vanessa Ennis), Sinquefield discussed the need for diversity when promoting Jones-Wilson. Ennis took notes of the conversation.

During the interview, Sinquefield told Ennis that Jones-Wilson "is qualified and *aligns with the company's DEI initiative*." *See* Investigation Summary, at 1 (Dckt. No. 63-16)

---

[2] Hopkins invoked the DEI policy a few different times in his brief. At times, Hopkins pointed to the DEI policy when addressing the "background circumstances" test for white plaintiffs, which did not survive *Ames*. *See* Pl.'s Resp. Br., at 2–3 (Dckt. No. 75). But at other times, Hopkins pointed to the DEI policy as evidence of pretext. *Id.* at 9, 14–15.

(emphasis added). Sinquefield also stated that "[Jones-Wilson's] qualifications stood out and she brings a fresh perspective to the *male-dominated* supervisor ranks in Chicago." *Id.* (emphasis added).

Hopkins views those statements as an admission that Norfolk Southern disfavored white, male applicants. *See* Pl.'s Resp. Br., at 3 (Dckt. No. 75). As Hopkins sees things, the phrase "aligns with the company's DEI initiative" is code for the fact that Jones-Wilson is a black female. And in his view, it doesn't take much decoding to figure that out.

In other words, Hopkins argues that Norfolk Southern didn't actually hire Jones-Wilson because of her superior credentials. Hopkins believes that the company hired Jones-Wilson because she is a black woman, and the hiring satisfied the company's diversity initiatives.

As far as this Court can tell, the parties didn't submit the DEI Initiative as part of the record. *See* Index of Exhibits (Dckt. No. 69-2). It's hard to evaluate the DEI policy without getting a copy of the DEI policy. This Court is left with snippets of testimony about the DEI policy.

Evidence that a company considered diversity when making a hiring decision seems relevant to whether the company engaged in discrimination. Diversity can mean race, and race can't be a reason for getting or losing a job. Calling it "diversity" doesn't change the reality that the employer is considering race, which it can't do.

The Seventh Circuit recently drew a line between promoting diverse candidates (on the one hand) and disfavoring white candidates (on the other). According to the Court of Appeals, an employer's interest in hiring diverse talent "only shows that [the employer] was concerned with minority hiring and retention – it does not support an inference that the [employer] was

intentionally discriminating against white employees." *See Dunlevy*, 52 F.4th at 353; *see also Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 438 (7th Cir. 2014).

That sentence was dicta. In the very next sentence, the Seventh Circuit was quick to say that "we do not decide this issue." *See Dunlevy*, 52 F.4th at 353. The Seventh Circuit didn't cite any supporting case law, either, which underscores that the Court of Appeals was flagging but not deciding the issue. Plus, the Seventh Circuit was addressing the background circumstances test, which is a dead letter after *Ames.*

Still, one might wonder whether *Dunlevy*'s reasoning holds up post-*Ames* and in light of other recent Supreme Court decisions. *Ames* did away with the "background circumstances" test for Title VII plaintiffs. And the decision may sweep even more broadly. *Ames* casts a shadow on DEI policies that favor one group over another.

After all, *Ames* instructs courts "that the standard for proving disparate treatment under Title VII does not vary based on whether or not the plaintiff is a member of a majority group." *See Ames*, 605 U.S. at 310. Congress "establish[ed] the same protections for every 'individual' – without regard to that individual's membership in a minority or majority group." *Id.*

*Ames* reaffirms that everyone is held to the same standard when it comes to employment decisions. If that's right, then a policy that favors one group over another based on race seems problematic, even if done under the banner of diversity. No one would say that a policy favoring white men in employment decisions passes muster under Title VII. After *Ames*, it's not clear how a policy that favors any other group based on race, sex, or any other protected category can pass muster, either.

After all, hiring is a zero-sum game. Hiring one person necessarily means not hiring another. And preferring Person A over Person B because of Attribute X is problematic if

Attribute X is one of the protected categories under Title VII. Person B can't do anything about the fact that he or she doesn't have Attribute X. And Person B can't get the short end of the stick because he or she lacks Attribute X.

If a company can't consider Attribute X, then a company can't favor Person A over Person B because of Attribute X. There isn't much difference between favoring Person A based on Attribute X, and disfavoring Person B based on Attribute X.

*Ames* leveled the playing field. The days of favoring any group over another group based on race – even in the name of diversity – appear to be numbered, if not over. The winds seem to be shifting, and blowing (if not gusting) in a different direction. *Id.*; *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) ("Eliminating racial discrimination means eliminating all of it."); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (Roberts, C.J.) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part) ("It is a sordid business, this divvying us up by race."); *McDonald v. Santa Fe Trail Tansp. Co.*, 427 U.S. 273, 283 (1976) (Marshall, J.) ("hold[ing] today that Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable" to black litigants); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) ("Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.").

Simply put, perhaps a plaintiff might be able to establish pretext by showing that he or she lost an employment opportunity based on a diversity policy. But in the case at hand, Hopkins has not made that showing, for a few different reasons.

Hopkins relies on two sentences that Sinquefield said to the EEO investigator. But the Seventh Circuit has forewarned against resting a case on stray comments from a nondecisionmaker. "Stray remarks made by nondecisionmakers are not evidence that the decision had a discriminatory motive." *See Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001) (collecting cases); *Tate v. Ancell*, 551 F. App'x 877, 888 (7th Cir. 2014) ("Given Humphrey's absence from Tate's chain of command, her statement is of a piece with the kinds of 'stray remarks' of non-decisionmakers that we routinely discount as proof of an employer's alleged animus.") (collecting cases); *Meyers v. Indianapolis Pub. Schs. Bd. of Sch. Commissioners of City of Indianapolis*, 724 F. App'x 485, 487 (7th Cir. 2018) ("Stray remarks made by nondecisionmakers are not evidence that the discharge decision had a discriminatory motive.") (cleaned up); *Mlynczak v. Bodman*, 442 F.3d 1050, 1057–58 (7th Cir. 2006) (finding that a number of discriminatory comments made by a nondecisionmaker did not show that the employer discriminated).[3]

Sinquefield didn't interview Hopkins, and he didn't play any role in evaluating his application. Four other people interviewed Hopkins, and they decided to take a pass on him. They recommended Jones-Wilson and Butkiewicz instead.

[3] Recently, the Seventh Circuit held that courts should consider "discriminatory comments and actions by non-decisionmakers" when "assessing workplace culture." *See Pratt v. Wisconsin Aluminum Foundry*, 2026 WL 2123935, at *7 (7th Cir. 2026). In *Pratt*, the plaintiff brought a sex discrimination claim under Title VII. The plaintiff wanted to introduce evidence of stray remarks by non-decisionmakers to demonstrate pretext. The plaintiff was called a "bitch" and "cunt" by coworkers after reporting workplace harassment. The plaintiff wanted to introduce those "stray remarks" as evidence that her supervisor "relied on input he understood to be discriminatory and acceded to the discriminatory atmosphere, [so] his own decision to discharge [the plaintiff] was made because of her sex." *Id.* at *7. Judge Kirsch dissented from the majority's ruling on the plaintiff's sex discrimination claim. Judge Kirsch noted "when a plaintiff attempts to prove direct discrimination by using the conduct or speech of non-decisionmakers, we apply our rules for stray remarks and cat's paw liability. The majority says this case is special – that it isn't governed by our rules on stray remarks, cat's paw liability, or hostile work environment." *Id.* at *15 (Kirsch, J., dissenting in part). This Court doesn't understand the *Pratt* majority to undo the ordinary rules on "stray remarks." And in any event, the facts of *Pratt* are distinguishable from this case. In *Pratt*, comments were vitriolic, aggressive, and pervasive. That's not the case here.

Importantly, the record does not include any evidence that the four interviewers favored Jones-Wilson and Butkiewicz based on race, or disfavored Hopkins based on race. There is no evidence that they considered the DEI policy when making their recommendations.

Sinquefield didn't sit on the next rung of the ladder, either. The interviewers recommended Jones-Wilson and Butkiewicz to Superintendent Fogarty. And Fogarty, in turn, considered the applications and eventually recommended them to Sinquefield. *See* Pl.'s Resp. to Def.'s Statement of Facts, ¶¶ 27–28 (Dckt. No. 71). Once again, there is no evidence that Fogarty favored Jones-Wilson and Butkiewicz based on race, or disfavored Hopkins based on race.

True, Sinquefield made the final decision on who should get the promotions. At the very least, he signed off on the recommendations. But by the time that the applications of Jones-Wilson and Butkiewicz reached his desk, the company had already weeded Hopkins out. His goose was cooked before Sinquefield ever saw the applications of Jones-Wilson and Butkiewicz.

In essence, Hopkins got knocked out of the tournament before reaching the second round, meaning the second rung of the ladder. There is no evidence that race played any role in that decision. Hopkins was out of contention and out of the running before reaching the second stage. And Sinquefield sat on the third rung of the ladder. So it's hard to see how any statement by Sinquefield could have any evidentiary value.

At best, a senior executive made a few comments about the company's DEI objectives, but that executive didn't play a role in putting a fork in the application from Hopkins. So they aren't enough to support a claim.

Plus, counsel for Hopkins asked Sinquefield point blank at deposition if he promoted Jones-Wilson because she is black. He said no. *See* Sinquefield Dep. Tr., at 20:11-23 (Dckt. No. 63-3).

Hopkins has little else to go on. He points to the fact that the company has a DEI policy (which isn't in the record). But the existence of a policy, without more, isn't enough to get to a jury on a discrimination claim. A plaintiff must offer evidence that the policy made a difference in the employment decision at issue.

"[T]he simple fact that such a policy exists does not prove that intentional discrimination is the reason why a particular individual was not hired or promoted." *See Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006). Even if a decisionmaker "was philosophically favorable to the hiring of minorities, that does not prove that any particular decision he made was for discriminatory reasons." *Id.*

Hopkins "must establish a link between the policy and the employment decision about which he . . . is complaining." *Id.* "Alone, the mere existence of an affirmative action policy is, however, insufficient to prove that the employer actually intentionally discriminated against the employee. A Title VII plaintiff must establish a link between the employer's affirmative action policies and its actions toward her in order to show intentional. [sic] discrimination." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 722 (7th Cir. 2005) (cleaned up).

Here, Hopkins did not present evidence that the DEI policy played any role in the decision to pass him over. Without a connection, the existence of the policy can't support a claim.

In sum, Hopkins cannot get to a trial when viewing the evidence under the *McDonnell Douglas* framework. But the same answer applies under *Ortiz* (which Hopkins did not cite, let

alone argue). Viewing the evidence holistically in a light favorable to Hopkins, the record does not include enough evidence to support a finding of discrimination by a reasonable jury. The record confirms that the company passed over Hopkins based on his qualifications and his poor interview, not because of his race.

## II. Sex Discrimination

The discrimination claim in the complaint includes a second theory. Hopkins alleges that Norfolk Southern discriminated against him on the basis of sex. He claims that the company hired Jones-Wilson because she is a woman, and he is a man.

Hopkins barely discusses the sex discrimination theory in his summary judgment brief. *See* Pl.'s Mem. in Opp'n to Mtn. for Summ. J. (Dckt. No. 75). He points to the same body of evidence as his race discrimination claim. He points to statements made by Sinquefield to the EEO investigator.

Sinquefield said that Jones-Wilson "is qualified and aligns with the company's DEI initiative." *See* Investigation Summary, at 1 (Dckt. No. 63-16). Sinquefield also stated that "[Jones-Wilson's] qualifications stood out and she brings a fresh perspective to the male-dominated supervisor ranks in Chicago." *Id.*

The sex discrimination claim fails for the same reasons as his race discrimination claim. Without belaboring the point, Hopkins has failed to come forward with enough evidence to support a prima facie case. Norfolk Southern came forward with a non-discriminatory reason for its hiring decisions, and Hopkins has not shown that that reason is pretextual.

## III. Retaliation

The second claim is a retaliation claim under Title VII. Once again, viewing all of the evidence in a light favorable to Hopkins as the non-movant, Hopkins comes up short.

Title VII prohibits an employer from taking adverse action against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]" *See* 42 U.S.C. § 2000e-3(a).

To overcome summary judgment, Hopkins "must offer evidence from which a reasonable jury could find: '(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.'" *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)). "Failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006).[4]

Hopkins satisfied the first requirement. He engaged in protected activity on August 17, 2021, by complaining about the promotion of Jones-Wilson to the Norfolk Equal Opportunity Office. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 30 (Dckt. No. 71). He complained that the company promoted her "only based on her race, her sex, and her sexual orientation." *Id.*

Hopkins contacted the company's Equal Opportunity Office again on December 20, 2021. He complained that the company refused to change his flexible holiday because of his discrimination complaint in August. *Id.* at ¶ 53.

Hopkins got over the first hurdle. But the next two hurdles loom large, and stand in the way of a jury trial. Hopkins did not present sufficient evidence of an adverse employment action caused by a protected activity.

---

[4] Hopkins noted that he "proceeds under the direct method of proof for proving retaliation." *See* Pl.'s Resp. Brf., at 22 (Dckt. No. 75). But the Seventh Circuit has rejected the distinction between direct and indirect method of proof. Instead, evidence "must be considered as a whole . . . . Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded." *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "[D]istrict courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id.*

"For a retaliation claim, a materially adverse action is defined as an action 'that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *See Lesiv*, 39 F.4th at 911–12 (quoting *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016)).

The Seventh Circuit has held that "[a]dverse employment actions include a broad array of actions such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits.'" *See McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625 (7th Cir. 2004) (quoting *Burlington Indus., v. Ellerth*, 524 U.S. 742, 761 (1998)). But "[a] materially adverse action must rise above trivial harms, such as petty slights or minor annoyances[.]" *Burkhead v. Off. of Chief Judge of Cir. Ct. of Cook Cnty.*, 2024 WL 1376067, at *7 (N.D. Ill. 2024) (cleaned up).

Hopkins points to three alleged adverse actions. None of them get him very far.

First, Hopkins points to the August meeting with Fogarty, Sinquefield, and Moran, where they discussed his complaint of discrimination. The meeting took place a few weeks after he complained about discrimination. Hopkins states he was "abruptly called to a meeting [and] verbally assaulted and threatened for having filed the [EEO] Complaint." *See* Pl.'s Resp. Brf., at 23 (Dckt. No. 75); *see also* Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 70).

That's an overly generous reading of the deposition testimony, even when reading it in his favor. Hopkins testified that Sinquefield "threatened to take my K9 away in the TEAM meeting that we had on, I believe it was, the 31st of August, right after I made the complaint about – right after I filed my complaint, my EEO complaint." *See* Hopkins Dep. Tr., at 140:10-16 (Dckt. No. 69-3).

Hopkins didn't squarely testify that Norfolk Southern threatened to take his dog away *because* he complained about discrimination. At best, he said that a conversation about his dog took place during the same call that addressed his discrimination claim.

Read in context, the issue with his dog had to do with a compensation issue. "[T]here was something brought up about the compensation for the K9, and Sinquefield tells me I'll just take your dog away." *Id.* at 141:24 – 142:2. He testimony is cryptic and murky, to put it mildly. It is too murky to support a finding by a reasonable jury of an adverse employment action.

The other snippet of testimony doesn't add much, either. At one point, Hopkins testified that he was "called to the carpet about the discrimination." *Id.* at 53:4-5; *see also* Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 70). That's too general and conclusory to support anything.

Even if Hopkins had a testy conversation with his supervisors, that sort of conversation isn't enough to establish an adverse employment action. The statute does not prohibit retaliation writ large. It prohibits retaliation for engaging in a protected activity.

A plaintiff engages in a "[p]rotected activity" when he or she takes "some step in opposition to a form of discrimination that [Title VII] prohibits." *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011); *Antonetti v. Abbott Lab'ys*, 563 F.3d 587, 592 (7th Cir. 2009) ("Title VII protects employees 'from retaliation for complaining about the types of discrimination it prohibits.'").

"Personality conflicts at work that generate antipathy" or "snubbing by supervisors and co-workers are not" materially adverse employment actions. *See Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) (cleaned up); *see also Grana v. Illinois Dep't of Transp.*, 232 F. Supp. 2d 879, 887 (N.D. Ill. 2002) (holding that "a less-than-desirable rapport with his supervisors does not constitute an adverse employment action").

Maybe Hopkins had a chippy call with his bosses about his discrimination complaint. But a contentious call, without more, is not an adverse employment action. And nothing in the record could support a finding that that call would discourage a discrimination complaint.

Second, Hopkins argues that the company retaliated against him by failing to pay an ambulance bill for an on-the-job injury. Once again, there isn't much there.

Hopkins suffered an injury at work on October 19, 2021, a few months after complaining about the lack of a promotion. *See* Hopkins Dep. Tr., at 51:14-22 (Dckt. No. 69-3). Hopkins went in an ambulance, and later got a bill. *Id.*

Hopkins put an unmarked copy of the bill in the office mailbox of SAC Moran in November 2021. *Id.* at 252:3 – 253:10. But it included no other information. Hopkins didn't include any note saying what the bill was for. *Id.* He didn't even reveal that Hopkins wanted Norfolk Southern to pay it. *Id.*

Norfolk Southern later figured out what the bill was for. And then, Norfolk Southern paid the bill. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 78).

True, Norfolk Southern didn't pay the bill right away. But nothing in the record suggests that the company dragged its feet because Hopkins complained about discrimination. If anything, the record shows that the company didn't pay the bill right away because it didn't know what it was.

Third, Hopkins contends that the company fired him on December 22, 2021. *See* Pl.'s Resp. to Def.'s Statement of Facts, at 14 (Dckt. No. 71). In the alternative, he argues that he was constructively discharged. *See* First Am. Cplt., at 6 (Dckt. No. 23).

Termination is an adverse employment action. *See, e.g.*, *McKenzie*, 381 F.3d at 625. So is constructive discharge. *See, e.g.*, *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010).

The constructive discharge theory is a repeat of his allegations about the Teams meeting, and the ambulance bill. Hopkins alleges that the company made things intolerable for him by criticizing him in that call, and failing to pay the bill. So the constructive discharge theory is nothing new.

Termination is an adverse employment action, but a plaintiff must show a connection between the termination and the protected activity. "A retaliation claim under Title VII requires a plaintiff to establish 'that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" *Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (quoting *Univ. of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013)).

"In making this showing, an employee may refer to direct evidence or circumstantial evidence such as 'suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual.'" *Kline v. United Airlines, Inc.*, 2024 WL 3594643, at *12 (N.D. Ill. 2024) (quoting *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 892 (7th Cir. 2024)).

Hopkins contends that he was fired, and Norfolk Southern insists that Hopkins resigned. Hopkins is the non-movant, so for purposes of this motion, this Court will assume that the company fired him. Even so, his claim is going nowhere fast.

Hopkins doesn't come close to showing that Norfolk Southern fired him because he complained about discrimination. For starters, the two events took place months apart. Hopkins

complained about discrimination in August 2021, and the company fired him in December 2021. That's roughly the same amount of time as an NFL regular season, plus preseason.

The events took place far apart in time. True, Hopkins did complain again on December 20, 2021. That's when he complained that the company refused to change his flexible holiday because of his discrimination complaint in August. Even so, it's hard to see the connection. Plus, "[e]vidence of temporal proximity, however, standing on its own, is insufficient to establish a causal connection for a claim of retaliation." *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008).

The record doesn't include any meaningful evidence of a connection between the complaint about discrimination and the termination. Hopkins provides "no direct evidence of but-for causation such as admissions of retaliatory animus by the decisionmakers." *Kline*, 2024 WL 3594643, at *12. He doesn't provide any circumstantial evidence, either. *Id.*

If anything, the record shows that Hopkins left the company a day or two after he refused to sign the form about outside employment. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 64 (Dckt. No. 71). Fogarty and Cottrell told Hopkins that he would remain out of service and investigated for insubordination. *Id.*; *see also* Hopkins Dep. Tr., at 174:16-23 (Dckt. No. 63-2).

The record confirms that he engaged in insubordination shortly before losing his job. It is a stretch to suggest that Hopkins left the company because he complained about discrimination in August, four months earlier.

On this record, no reasonable jury could side with Hopkins on the retaliation claim. A verdict that Norfolk Southern retaliated against Hopkins for complaining about discrimination is a bridge too far. No reasonable jury could cross it and get there.

## IV. Hostile Work Environment

Hopkins hasn't presented enough evidence to get to jury. But there is one other topic to cover.

A short portion of Hopkins's brief is titled "Hostile Work Environment." *See* Pl.'s Resp. Brf., at 26 (Dckt. No. 75). Hopkins sprinkles the phrase "hostile work environment" throughout his amended complaint.

It is not clear what, exactly, Hopkins is alleging. Maybe Hopkins is claiming that the company subjected him to a hostile work environment that amounted to race and sex discrimination. Or maybe Hopkins is alleging that the company retaliated against him by subjecting him to a hostile work environment.

The phrase "hostile work environment" is thrown around, untethered to any particular claim. The phraseology doesn't get him very far.

A hostile work environment can constitute discrimination. "Specifically, a plaintiff must show that '(1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability.'" *Beal v. Pac. Rail Servs., Inc.*, 647 F. Supp. 3d 636, 640 (N.D. Ill. 2022) (quoting *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019)).

"As to the third element, a court must consider whether the race-based conduct is severe, frequent, physically threatening or humiliating, and whether it interfered with the employee's performance." *Martinez v. Nw. Mem'l Healthcare*, 2021 WL 4635798, at *5 (N.D. Ill. 2021) (citing *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018).

The record at hand doesn't come close to satisfying that standard. The record is empty when it comes to hostile treatment based on his race. There are no taunts, threats, smears, jokes, jabs, comments, disparagements, pranks, or anything in that neighborhood. The record doesn't even include any "immature and ignorant behavior" directed at Hopkins. *See Yancick v. Hanna Steel Corp.*, F.3d 532, 546 (7th Cir. 2011).

A hostile work environment can constitute retaliation, too. "The Seventh Circuit has made it clear that the 'creation of a hostile work environment can be a form of retaliation."' *McKinney v. Chicago Transit Auth.*, 2022 WL 2257246, at *9 (N.D. Ill. 2022) (quoting *Smith v. Northeastern Illinois University*, 388 F.3d 559, 567 n.5 (7th Cir. 2004)).

But once again, there is nothing there. The phrase "hostile work environment" is empty, and full of air, supported by nothing.

Hopkins is grasping at straws. But there are no straws. And straws can't support a lot of weight anyway.

**Conclusion**

For the reasons explained above, Defendant Norfolk Southern's motion for summary judgment is hereby granted.

Date: August 14, 2026

Steven C. Seeger
United States District Judge